# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# CIVIL CASE NO: 3:09-CV-377-RJC-DCK

| | |
|---|---|
| CGM, LLC, | ) |
| Plaintiff, | ) |
| | ) **MEMORANDUM AND** |
| v. | ) **RECOMMENDATION** |
| | ) |
| BELLSOUTH TELECOMMUNICATIONS, INC., AT&T BILLING SOUTHEAST, LLC, and AT&T, CORP., | ) |
| Defendants. | ) |

**THIS MATTER IS BEFORE THE COURT** on Defendant BellSouth Telecommunications, Inc.'s ("BellSouth") "Motion to Dismiss" (Document No. 25), and Defendants AT&T Billing Southeast, LLC, and AT&T Corporation's jointly filed "Motion to Dismiss" (Document No. 27). Plaintiff CGM, LLC ("Plaintiff" or "CGM") opposes both motions. The motions have been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. §636(b), and are ripe for disposition. Having carefully considered the record, including the parties' briefs, and applicable authority, the undersigned will respectfully recommend that the motions to dismiss be granted. CGM lacks standing to bring this lawsuit.

## I. BACKGROUND

This is an action for declaratory judgment brought by CGM (a billing agent for about forty competitive local exchange carriers or "CLECs") against BellSouth (an incumbent local exchange carrier or "ILEC") over promotional discounts to BellSouth/AT&T telephone customers and the calculation of corresponding credits to CGM's client CLECs. These credits affect the wholesale price of telephone services, and in turn, the retail price that the CLECs can offer to their own

customers. At the heart of the dispute is whether BellSouth has impermissibly placed CGM's CLEC clients at a competitive disadvantage through unfair and improper wholesale pricing. In addition to BellSouth, CGM has named AT&T Billing Southeast, LLC, and AT&T Corporation (collectively, "AT&T Defendants") as parties to this lawsuit.

On July 1, 2009, AT&T Southeast Region sent a notice letter advising that it planned to change its method for calculating promotional credits issued to CLECs, effective September 1, 2009. (Document No. 1, ¶ 64; Ex.1 and 2). The letter indicates that it was sent on behalf of nine issuing AT&T ILECS, including AT&T North Carolina, and appears to be the root cause of the instant litigation. The new method of calculation was apparently intended to "determine the impact that the retail cash-back offer has on the monthly rate the average AT&T retail customer pays for the telecommunications service(s) eligible for a cash back type promotion, as well as the promotional credits available to resellers." (Id., Ex. 1, p. 2). Purportedly, a percentage of the promotional credits received by its client CLECs is paid to CGM for its services. Exhibits attached to the Complaint show that correspondence was exchanged between AT&T Services, Inc. and CGM regarding the dispute over proper billing for the promotional credits. (Document No. 1, Ex. 3-4).

CGM filed its "Complaint for Expedited Declaratory Judgment" (Document No. 1) ("Complaint") in this action seeking to raise claims on behalf of itself and its CLEC clients, pursuant to alleged violations of the Federal Telecommunications Act of 1996 ("1996 Act"). These CLECs are not named as parties or otherwise identified in the Complaint. CGM asserts that it has a financial interest in this matter by virtue of its separate contracts with the CLECs and is therefore entitled to the relief sought. CGM contends that BellSouth is "failing to calculate wholesale prices to CLEC resellers properly," thereby affecting CGM's revenue from its contractual percentage of CLEC sales.

(Document No. 1, ¶ 1). CGM alleges that BellSouth overcharges the CLECs by calculating promotional credits that do not provide the CLECs with "the full, dollar for dollar, value of the credit offered to . . . BellSouth's retail customers" for cash-back promotions. CGM challenges BellSouth's use of this new formula in part because BellSouth did not *first* prove to the relevant state public utility commissions that these credits were "reasonable and nondiscriminatory." (Id. ¶¶ 2, 18(1)).

The Complaint alleges that both the former and the revised formulas are improper, and insists that BellSouth must pass on to the CLECs the "full dollar for dollar" face amount of the promotion. (Id., ¶¶ 43, 70). CGM asserts that both formulas amount to "restrictions" on resale, are "presumptively unlawful," and require the ILEC (not the CLECs) to obtain prior approval by a state utility commission. (Id. ¶ 72). CGM asserts that this result is required by 47 C.F.R. § 51.613(b) and BellSouth Telecommunications, Inc. v. Sanford, 494 F.3d 439, 450 (4th Cir. 2007). CGM alleges that BellSouth and the AT&T Defendants acted in concert in engaging in an "illegal billing scheme" and "violated federal telecommunications law by acting inconsistently with the dictates of Sanford." (Document No. 33, p.5).

In terms of relief, CGM seeks a declaration that the Defendants must credit the CLECs with the "full, dollar for dollar, value of the credit offered to BellSouth's retail customers in the absence, as here, of Defendants having first proved to the appropriate regulatory body that their contrary practice to date is reasonable and nondiscriminatory." (Document No. 1, ¶ 80). CGM also seeks a declaration that BellSouth may not use *either* the pre-September 1, 2009 methodology or the new "Formula" until it has obtained approval from the relevant state commissions. CGM asks this Court to declare that "its reading of Sanford is the correct one, and asks this Court to so declare by validating CGM's position." (Id. ¶ 68).

3

On September 21, 2009, BellSouth and the AT&T Defendants filed separate motions to dismiss. After the initial round of briefing was complete, supplemental briefs were filed. In addition, CGM has filed a "... Notice Regarding Subsequently Decided Authority"(Document No. 45) on December 7, 2009, based on a decision of the U.S. District Court for the Northern District of Texas: 1) granting the CLECs' request for preliminary injunction against BellSouth's use of the revised formula at issue here; and 2) staying that case while BellSouth sought a determination from various state commissions. (Document No. 45-1). The issues raised by Plaintiff here have not been presented to the relevant state commissions for review.

## II. STANDARD OF REVIEW

Defendants argue that the Complaint fails to state a claim upon which relief can be granted. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, – U.S. –, 129 S.Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).[1] "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 129 S.Ct. at 1954 (explaining that "the Federal Rules do not require courts to credit a complaint's conclusory statements without reference to its factual context."). The facts alleged "must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555; see also, Robinson v. American Honda Motor Co., Inc., 551 F.3d 218, 222 (4th Cir. 2009). A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of a complaint. Francis v. Giacomelli, 588 F.3d 186, 192 (4th Cir. 2009); Fed.R.Civ.P. 12(b)(6). The Court must accept as

---

[1] Twombly involved a consumer class action against ILECs for alleged antitrust conspiracy. The United States Supreme Court held that allegations of parallel business conduct and a bare assertion of conspiracy were insufficient to state a claim under the Sherman Act.

true all well-pleaded factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff, but "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments," Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008).

> It is well settled that under Article III of the United States Constitution, a plaintiff must establish that a "case or controversy" exists "between himself and the defendant" and "cannot rest his claim to relief on the legal rights or interests of third parties." Warth v. Seldin, 422 U.S. 490, 498-99 (1975). Standing has three elements:
>
>> First, the plaintiff must have suffered an injury in fact-an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of-the injury has to be fairly ... trace[able] to the challenged action of the defendant, and not ... the result [of] the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Smith v. Frye, 488 F.3d 263, 272 (4th Cir. 2007) quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).

> The nature of the injury is central to the Art. III inquiry, because standing also reflects a due regard for the autonomy of those most likely to be affected by a judicial decision. "The exercise of judicial power ... can so profoundly affect the lives, liberty, and property of those to whom it extends," that the decision to seek review must be placed "in the hands of those who have a direct stake in the outcome." It is not to be placed in the hands of "concerned bystanders," who will use it simply as a "vehicle for the vindication of value interests."

Diamond v. Charles, 476 U.S. 54, 106 S.Ct. 1697 (1986) (internal citations omitted).

### III. ISSUES PRESENTED

BellSouth moves for dismissal pursuant to Rule 12(b)(6) because CGM lacks standing to

assert the claims alleged in the Complaint and the Complaint fails to state a claim upon which relief can be granted. (Document No. 25). Specifically, BellSouth argues: 1) that CGM is a billing agent, not a CLEC, and is not a party to any interconnection agreement ("ICA"), and thus, is not the real party in interest and lacks standing; 2) that the prices BellSouth charges CLECs for telecommunication services are governed exclusively by ICAs between the CLECs and BellSouth, and no breach of any ICA is alleged here; 3) that no order of any relevant state commission is challenged here, which BellSouth argues is the only basis to proceed in federal court under the 1996 Act; 4) that CGM has no direct rights under the 1996 Act and has no cognizable claim for a direct violation of § 251(c)(4); 5) that prior approval by the relevant state commissions is not required for BellSouth to change its calculation method because the new formula is not a "restriction on resale" for purposes of 47 C.F.R. § 51.613; and 6) CGM is not entitled to "the full dollar for dollar value of the promotion," based on the 1996 Act and BellSouth's reading of the Fourth Circuit's decision in <u>Sanford</u>. (Document No. 26).

By separate motion, the AT&T Defendants move for dismissal pursuant to Rule 12(b)(6) "because CGM lacks standing to assert the claims alleged in the Complaint; the Complaint fails to state a claim upon which relief can be granted against any Defendant in any event; and the Complaint fails to state a claim upon which relief can be granted with respect to AT&T Corp. and [AT&T] Billing in particular because neither of them owes the legal duties that the Complaint alleges were violated." (Document No. 27).

## IV. DISCUSSION

The parties disagree on nearly every aspect of this action. They dispute standing, characterize the legal basis for this action differently, disagree over regulatory requirements,

disagree as to who (CLECs or ILECs) must proceed in which forum (state commission or federal court), and argue over the meaning and application of numerous terms in the 1996 Act and its implementing regulations, including whether BellSouth's new *and* prior calculation methods amount to restrictions on resale.

The undersigned concludes in the end that Plaintiff CGM lacks standing to bring this specific action. Having said that, some discussion of the Federal Telecommunications Act of 1996, the Sanford decision, and the contentions of the parties inform this conclusion and are a necessary part of this order.

**A. The Federal Telecommunications Act of 1996**

The Federal Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (1996) (47 U.S.C. § 151 *et seq*.) introduced competition into local telecommunications markets.[2] The Federal Communications Commission ("FCC") is responsible for regulating the substantive requirements of the 1996 Act. See 47 U.S.C. § 251(d)(1) and 47 U.S.C. § 154. Under the 1996 Act, an ILEC must provide network access to requesting CLECs under the terms of interconnection agreements ("ICAs"). 47 U.S.C. § 251(c). In other words, large telephone companies with existing telecommunications infrastructure must share their networks with smaller competitors. This was intended to promote competition in telecommunication markets. Verizon Communications, Inc. v.

---

[2] The 1996 Act was enacted subsequent to the Government's antitrust suit against American Telephone and Telegraph Company ("AT&T"). Pursuant to a 1982 consent decree, AT&T was divested of its local operating companies and was required to provide equal access to interconnection facilities. AT&T remained as a long-distance and equipment company, and the divested carriers were limited to providing local telephone service. See United States v. American Telephone & Telegraph Co., 552 F.Supp. 131 (D.D.C.1982), aff'd. *sub nom*. Maryland v. United States, 460 U.S. 1001 (1983). The provisions of the 1996 Act were designed to eliminate the local monopolies formerly held by AT&T's local operating companies.

F.C.C., 535 U.S. 467, 473 (2002).

The rates, terms and conditions under which a CLEC obtains telecommunications services from an ILEC are governed by an ICA agreement between the CLEC and ILEC. 47 U.S.C. § 251(c)(2). The 1996 Act provides the procedures for negotiation, arbitration, and approval of ICA agreements. 47 U.S.C. § 252. The ICA agreements may be reached through voluntary negotiation or compulsory arbitration. Id. at § 252(a)-(b). Any ICA adopted by negotiation or arbitration shall be submitted to the relevant state utilities commission, which approves or rejects the ICA. Id. at § 252(e)(1).

Federal district courts have exclusive jurisdiction to review the state commission's determinations relating to ICAs under the 1996 Act. Id. at § 252(e)(6) ("In any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 and this section [252].").

In connection with the duty to make network access available, the 1996 Act also requires ILECs to "offer for resale at wholesale rates any telecommunications service that the carrier provides at retail to subscribers who are not telecommunications carriers." 47 U.S.C. § 251(c)(4). In other words, CLECs may purchase telephone services from the ILEC at a discounted wholesale price and then resell those telephone services to individual customers at retail rates.

The purpose of Title 47 of the Code of Federal Regulations, Chapter I, Subchapter B, Part 51, is to provide rules for the implementation of sections 251 and 252 of the 1996 Act. 47 C.F.R. § 51.1. Under the implementing regulations, an ILEC's resale obligation extends to promotional offerings that last longer than 90 days. 47 C.F.R. § 51.613(a). "With respect to any restrictions on

8

resale not permitted under paragraph (a), an incumbent LEC may impose a restriction only if it proves to the state commission that the restriction is reasonable and nondiscriminatory." 47 C.F.R. § 51.613(b).

In considering issues related to the 1996 Act and promotions, the U.S. District Court for the Eastern District of North Carolina has concluded "that the substance and specificity of rules concerning which discount and promotion restrictions may be applied to resellers in marketing their services to end users is a decision best left to state commissions, which are more familiar with the particular business practices of their incumbent LECs and local market conditions." dPi Teleconnect, L.L.C. v. Sanford, 2007 WL 2818556, *7 (E.D.N.C. 2007) quoting *In re Implementation of the Local Competition Provisions of the Telecomm. Act of 1996*, 11 F.C.C.R. 15,449 ¶ 952 (1996).

47 U.S.C.251(c)(1) requires an ILEC "to negotiate in good faith in accordance with section 252 . . . to fulfill the duties prescribed in paragraphs (1) through (5)," including the duty "not to impose unreasonable or discriminatory conditions or limitations on, the resale of telecommunication services." 47 U.S.C. § 251(c)(1) and (b)(1). CGM has not alleged that any Defendant has refused, or failed, to negotiate in good faith. It is unclear what, if any, ICAs exist between Defendants and the CLECs purportedly represented by CGM that may be relevant to the issues here. No ICAs are cited in the Complaint. Plaintiff itself does not claim to be an ILEC, or a CLEC, or a party to any ICA or other contract with Defendants. Therefore, it appears to the undersigned that Plaintiff lacks standing to pursue the relief it seeks under the 1996 Act.

## B.  The Sanford Decision

Plaintiff contends that the BellSouth Telecomms., Inc. v. Sanford, 494 F.3d 439 (4th Cir. 2007) decision is central to the present dispute and that "CGM has been damaged by Defendants' refusal to follow Sanford, and will be damaged in the future by implementation of the Formula." (Document No. 1, ¶ 17). In the Sanford case, BellSouth (as ILEC) challenged several orders of the North Carolina Utilities Commission ("NC Commission"). CGM's Complaint requests declaratory judgment interpreting the Act pursuant to 47C.F.R. § 51.613(b) and Sanford. (Document No. 1, ¶ 18).

In the Sanford matter, the Public Staff of the NC Commission had filed a motion with the NC Commission for a ruling on ILEC incentive offers. Id. at 442.[3] In response, the NC Commission issued an "Order Ruling on Motion Regarding Promotions" on December 22, 2004, followed by a clarifying order on June 3, 2005, under the authority of § 47 U.S.C. 252(d)(3). Id. at 443-44. The NC Commission's orders held that the value of BellSouth's incentive offers, when extended to subscribers for more than 90 days, created a promotional rate that had to be offered to competing providers in the form of a reduced wholesale price.

Dissatisfied with the NC Commission's ruling, BellSouth filed suit in the Western District of North Carolina pursuant to 47 U.S.C. § 252(e)(6). This Court granted summary judgment to BellSouth on the basis that the incentives were not "telecommunication services." The Fourth Circuit Court of Appeals ("Fourth Circuit") reversed, thereby upholding the NC Commission's orders. Sanford, 494 F.3d at 442. The Fourth Circuit pointed out that although BellSouth did not

---

[3] "The Public Staff of the NC Commission is an independent arm of the Commission responsible for representing consumers in matters before the Commission" and "is not supervised by the Commission." Sanford, 494 F.3d at 442, FN1.

have to furnish the CLECs with the actual promotional items, such as cash rebates, gift cards, toasters, coupons, and the like, the *value* of these promotions extending for more than 90 days had to be reflected in the retail rate used to compute wholesale rate charged to CLECs under the 1996 Act. Id. at 442-43, 450.

Specifically, the Fourth Circuit held that "[e]ven though we agree with the district court's conclusion that such incentives are not themselves 'telecommunications' that must be resold under § 251(c)(4), we agree with the NC Commission that incentives may nonetheless implicate the fee for telecommunications-the retail rate or consideration given by the consumer in exchange for telecommunications-and thereby affect the incumbent LEC's resale duty." Id. at 450. The Fourth Circuit explained that "as the NC Commission observed, by structuring its offerings with incentives, BellSouth would be able to price its competitors out of the market." Id. at 451. In upholding the NC Commission's orders, the Fourth Circuit stated that "we emphasize that the NC Commission has invited BellSouth to show that any particular restriction on resale is pro-competitive, reasonable, and not discriminatory." Id at 453.

The Fourth Circuit further opined that "[t]he degree of difficulty in valuing incentives, might, in some circumstances, support a claim that resale restrictions are reasonable and nondiscriminatory. But **such issues can be negotiated between BellSouth and competitive LECs or, failing success in negotiations, resolved by the NC Commission**." Id. at 454 (emphasis added). The Sanford decision discusses the special role played by actions of state commissions pursuant to U.S.C. ¶¶ 251 and 252 and the measure of respect those orders deserve. Id. at 447. Specifically, the Fourth Circuit opined that

> [t]he NC Commission's expertise and experience in applying communications law are considerable and even predate the enactment

11

> of the Telecommunications Act of 1996 . . . in a scheme involving cooperative federalism, federal courts should recognize the considered role of state agencies that have accepted Congress' invitation to become crucial partners in administering federal regulatory schemes. State commissions are granted authority under the Telecommunications Act, and, to the extent they voluntarily accept that authority, they become an important part of the entire regulatory scheme.

Id. at 448.

Without reaching the merits of Plaintiff's claims, the undersigned finds that the dictates of Sanford support a finding that Plaintiff lacks standing to bring this action.

### C. Standing

"[S]tanding is a threshold jurisdictional issue that must be determined first because [w]ithout jurisdiction the court cannot proceed at all in any cause." Covenant Media of North Carolina, L.L.C. v. City of Monroe, N.C., 285 Fed.Appx. 30, 34 (4th Cir. 2008) (quoting Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 94 (1998)). The "core component" of the requirement that a litigant have standing to invoke the authority of a federal court "is an essential and unchanging part of the case-or-controversy requirement of Article III." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992); Elk Grove Unified School Dist. v. Newdow, 542 U.S. 1, 11 (2004) ("Article III standing ... enforces the Constitution's case-or-controversy requirement."). "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." Warth v. Seldin, 422 U.S. 490, 498 (1975). .

Plaintiff CGM, as the party invoking federal jurisdiction, bears the burden of establishing its standing. Lujan, 504 U.S. at 561; see also, DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 342 (2006); Renne v. Geary, 501 U.S. 312, 316 (1991); and Friends for Ferrell Parkway, LLC v. Stasko, 282 F.3d 315, 320 (4th Cir. 2002).

To satisfy the constitutional standing requirement, a plaintiff must show that: (1) plaintiff suffered an injury in fact, which is an invasion of a legally protected interest that is concrete and particularized, and actual or imminent, not conjectural or hypothetical; (2) there is a causal connection between the injury and the conduct complained of; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision of the court. Lujan, 504 U.S. at 560-61 (citations and internal quotation marks omitted); South Carolina Wildlife Federation v. Limehouse, 549 F.3d 324, 329 (4th Cir. 2008) (same); Marshall v. Meadows, 105 F.3d 904, 906 (4th Cir. 1997).

Defendants point out that CGM is not a telecommunications carrier or a party to any ICA with BellSouth. Defendants assert that CGM is not the "real party in interest" and lacks standing to assert claims on behalf of the CLECs. Defendants also point out that CGM is a billing agent, not a CLEC. Indeed, this is not disputed. In the exhibits attached to the Complaint, CGM identifies itself as a "billing and carrier relations outsourcing company which serves about 40 BellSouth resellers" and that "CGM serves as the interface between its clients and BellSouth for inter-carrier billing and compensation issues." (Document No. 1, Ex. 3).

In the Complaint, Plaintiff asserts that it is "the authorized agent for certain CLEC resellers of BellSouth's ILEC services who operate within the BellSouth states" in the AT&T Southeast Region and has "contracts with its resellers to act as their agent in dealings with BellSouth." (Document No. 1, ¶3). Even assuming these facts to be true, this does not mean that CGM has authority to litigate on behalf of its clients. No documentation of such authority is in the record. Moreover, research has not revealed any telecommunication cases involving actions by "billing

13

agents" on behalf of CLECS.[4] Indeed, even the order submitted by CGM in its "Notice of Subsequent Authority" (Document No. 45) pertains to a case where the CLECs themselves sought a preliminary injunction against implementation of the revised formula also at issue here.

When the source of a plaintiff's claim is a statute that creates legal rights, "the standing question . . . is whether the . . . statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." Warth, 422 U.S. at 500. The judicial relief available under the 1996 Act, conferred by § 252(e)(6), is the review of a determination by a state commission related to an ICA: "In any case in which a State commission makes a determination under this section, any part aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 of this title and this section." 47 U.S.C. § 252(e)(6). "Access to an ILEC's network facilities comes only through specified procedures for forming "interconnection agreements," the Congressionally prescribed vehicle for implementing the substantive rights and obligations set forth in the Act." Michigan Bell Telephone Co. v. Strand, 305 F.3d 580, 582 (6th Cir. 2002).

BellSouth contends, and the undersigned agrees, that the 1996 Act spells out the duties of ILECs to CLECS, and that because CGM is not a CLEC, and not alleging violation of an ICA, it is not entitled to relief under the 1996 Act. Accordingly, the undersigned is not persuaded that the CGM has standing for its claims pursuant to Sanford and 47 C.F.R. ¶ 51.613(b), or that declaratory

---

[4] Research *does* reveal cases of CLECs bringing suit themselves. See, e.g., dPi Teleconnect, L.L.C. v. Sanford, 2007 WL 2818556, *1 (E.D.N.C. 2007). Pursuant to the 1996 Act, dPi and BellSouth voluntarily negotiated an ICA which the NC Commission approved. dPi subsequently filed a complaint against BellSouth with the NC Commission which was dismissed, and then sought judicial review of the Commission's decisions in federal court.

judgment is appropriate prior to review by the relevant state commissions.

CGM alleges that it is paid, in part, based on a percentage fee of the money it collects for the CLECs from promotions that the Defendants offer and give to BellSouth/AT&T customers. (Document No. 1, ¶ 3). CGM argues that its CLEC clients, and therefore CGM, face substantial monetary losses if the Defendants are permitted to implement the new formula for calculating promotional credits. However, the allegation that CGM derives its revenue from a percentage of the unnamed CLECs' revenue does not set forth a violation of CGM's own "legally protected interest" and is insufficient to confer standing. Lujan, 504 U.S. at 560-61 (requiring that a plaintiff must have "suffered an injury in fact, which is an invasion of a legally protected interest ..."). CGM has not satisfied "the prudential standing requirement that [it] assert [its] own legal rights and not those of third parties." Dixon v. Edwards, 290 F.3d 699, 711, fn. 19 (4th Cir. 2002) (citing Valley Forge Christian Coll v. Ams. United for Separation of Church and State, Inc., 454 U.S. 464, 474 (1982) ("[T]he plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.") (citation and quotations omitted).

CGM argues that it is asking the Court for a declaration of federal law, not enforcement of an ICA or interpretation of any ICA contract terms. Specifically, CGM seeks a declaration that its interpretation of the decision in BellSouth Telecommunications, Inc. v. Sanford, 494 F.3d 439, 450 (4th Cir. 2007) is correct. However, CGM has not carried its burden of showing that it has standing to assert claims on behalf of its CLEC clients, or its own interests pursuant to the Act and Sanford.

> Federal courts must hesitate before resolving a controversy, even one within their constitutional power to resolve, on the basis of the rights of third persons not parties to the litigation. The reasons are two. First, the courts should not adjudicate such rights unnecessarily, and it may be that in fact the holders of those rights either do not wish to assert them, or will be able to enjoy them regardless of whether the

> in-court litigant is successful or not. Second, third parties themselves usually will be the best proponents of their own rights. The courts depend on effective advocacy, and therefore should prefer to construe legal rights only when the most effective advocates of those rights are before them.

Singleton v. Wulff, 428 U.S. 106, 113-14, (1976) (internal citation omitted). In this case, it appears that the CLECs Plaintiff purports to represent would be the best proponents of the relief sought.

## V. CONCLUSION

CGM seeks declaratory judgment construing the dictates of the 1996 Act and Sanford, yet Plaintiff is not a CLEC or an ILEC, has not cited to any breached ICA or failure to negotiate an IAC, nor has Plaintiff cited any law supporting a third-party non-ILEC/CLEC bringing an action in federal court pursuant to the 1996 Act. Furthermore, all the pertinent caselaw seems to involve the review by federal courts of state commission rulings filed by either an ILEC or CLEC. The underlying controversy is based on the rights of CLECs that are not parties to this litigation, and the Court should hesitate before adjudicating those rights unnecessarily. Plaintiff has not sufficiently established a case or controversy between itself and Defendants that does not rest on the legal rights or interests of third parties. The undersigned will respectfully recommend that the motions to dismiss be granted for failure to state a claim upon which relief may be granted to this Plaintiff in this lawsuit.

## VI. RECOMMENDATION

**FOR THE FOREGOING REASONS,** the undersigned respectfully recommends that: BellSouth's "Motion to Dismiss" (Document No. 25), and the AT&T Defendants' "Motion to Dismiss" (Document No. 27), should be **GRANTED**.

## VII. NOTICE OF APPEAL RIGHTS

16

The parties are hereby advised that, pursuant to 28 U.S.C. § 636(b)(1)(C), and Rule 72 of the Federal Rules of Civil Procedure, written objections to the proposed findings of fact and conclusions law and the recommendations contained herein must be filed within fourteen (14) days after service of same. Responses to objections must be filed within fourteen (14) days after service of the objections. Failure to file objections to this Memorandum and Recommendation with the District Court will preclude the parties from raising such objections on appeal. Thomas v. Arn, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Clerk is directed to send copies of this Memorandum and Recommendation to counsel for the parties and the Honorable Robert J. Conrad, Jr.

Signed: March 16, 2010

David C. Keesler
United States Magistrate Judge